**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF NEW YORK**

RACHEL GURJAR and
SAHARA HENRY-BOHOSKEY,

                  Plaintiffs,

        -against-

THE FEEDFEED, LLC,
DANIEL RESNICK, JULIE RESNICK,
and JAKE COHEN,

                Defendants.

Case No. 22-CV-00036

**COMPLAINT**

**JURY TRIAL DEMANDED**

Plaintiffs Rachel Gurjar and Sahara Henry-Bohoskey, by their attorneys, Crumiller P.C., as and for their complaint against The Feedfeed, LLC ("Feedfeed"), and Daniel Resnick, Julie Resnick, and Jake Cohen (the "Individual Defendants"), allege as follows:

### NATURE OF THE ACTION

1.    Plaintiffs bring this action to remedy claims of race and gender discrimination and retaliation, including a hostile work environment, sexual harassment, and unequal pay, based on the horrific mistreatment they received as Feedfeed's only two full-time employees of color, as well as unpaid overtime claims.

2.    Plaintiffs were directed to work more than their white counterparts for less pay, treated worse in the form of a racially hostile work environment, treated worse in general, were subjected to racism and to retaliation for complaining about racist comments and behavior in the workplace. Ultimately, the work environment became so emotionally distressing to both Plaintiffs that they each independently felt they had no option but to resign.

3.    Defendants, including the Individual Defendants, are liable to Plaintiffs under the federal and state anti-discrimination laws, unequal pay laws, and New York State labor laws.

## PARTIES

4.      Plaintiff Rachel Gurjar is an individual woman of South Asian descent who is domiciled in Kings County, New York. She was employed by Feedfeed from May 2018 until December 23, 2020.

5.      Plaintiff Sahara Henry-Bohoskey is an individual Black woman who is domiciled in the state of California. She was employed by Feedfeed from August 2018 until January 29, 2021.

6.      Defendant Feedfeed is a limited liability corporation with its principal place of business at 1101 South San Pedro Street, Unit A, Los Angeles, CA 90015. Feedfeed is a digital cooking publication and culinary events company founded, owned and run by husband-and-wife duo Daniel and Julie Resnick.

7.      Defendant Daniel Resnick is an individual who, upon information and belief, is domiciled in Suffolk County, New York.

8.      Defendant Julie Resnick is an individual who, upon information and belief, is domiciled in Suffolk County, New York.

9.      Defendant Jake Cohen is an individual who, upon information and belief, is domiciled in Queens County, New York. Cohen served as Editorial and Test Kitchen Director for Feedfeed from December 2018 to December 2020.

## JURISDICTION AND VENUE

10.     This Court has subject matter jurisdiction over this action pursuant to 28 U.S.C. §§ 1331 and 1343, as Plaintiffs have asserted claims that arise under federal laws of the United States. This Court has supplemental jurisdiction over Plaintiffs' state law claims pursuant to 28 U.S.C. § 1367, as those claims are so related to federal claims in this action such that they form part of the same case or controversy.

11.     Venue is proper in the Eastern District of New York pursuant to 29 U.S.C. § 1391 (b)(2), because the events giving rise to Plaintiffs' claims occurred there.

## FACTUAL ALLEGATIONS

12.     Feedfeed is a platform that curates content shared by home cooks, chefs, and bloggers into categories and recipes sorted by ingredient, meal type or style for the average home cook. Feedfeed curates this content on their website and social media. Feedfeed's community editors help curate categories in their areas of expertise as well as add commentary. Feedfeed is run by spouses Julie and Dan Resnick.

13.      As of early 2018, Feedfeed was a small, all-white company, of fewer than 10 people.

14.     In May 2018, Gurjar and a colleague were both hired to start on the same day. Gurjar was hired as Feedfeed's Social Media Coordinator; Sara Tane, a white woman, was hired as Food Editor. Both women were hired at the same level and both reported to Molly Adams, the Senior Food Editor, who reported to the Resnicks.

15.     At the time, most of Feedfeed's employees were quite new: Adams, who had started in October 2015, and Giora Stuchiner, the Kitchen Manager, who had started in January 2018, were among the most senior and high-level employees.

16.     Gurjar had a culinary degree, seven years' experience in the culinary service industry, plus two dedicated years of PR and editorial experience. Tane had only two years of culinary editorial experience and no PR experience. Plaintiffs later learned that Tane's starting salary was a whopping twenty thousand dollars more than Gurjar's. Gurjar, a woman of color, was paid a starting salary of $50,200; Tane, a less-experienced white woman, was paid $72,000 annually.

17.     In August 2018, Henry-Bohoskey began working at Feedfeed as an intern, making $15 per hour.

18.     Both Plaintiffs worked hard to quickly establish themselves as smart, hardworking, talented employees. In September and October 2018, Plaintiffs both received title promotions and additional responsibilities, although these did not come with pay increases.

19.     In September 2018, just three months after being hired, Gurjar was given a title promotion to Test Kitchen Manager. In this Capacity, her duties included keeping Feedfeed's test kitchen stocked and running smoothly, ordering and preparing ingredients for recipe photoshoots and events at the direction of her supervisors, styling and photographing recipes at the direction of her supervisors, developing and cross testin0g recipes, performing in videos, and implementing website updates.

20.     In October 2018, Henry-Bohoskey was given a title promotion to "Community Manager", taking over the social media role which she had been assisting with. In addition to posting Feedfeed's online social media content, including hosting and producing online videos featuring various chefs and social media influencers, she was also expected to edit and post over 300 recipes per week, and to manage and report on social analytics. She was informed that she would not begin receiving a salary until January, at which point she was put on a salary of $45,000 – an amount, like Gurjar's, she later learned was significantly less than Feedfeed's white employees were being paid.

21.     Though no longer an intern, Henry-Bohoskey found she was still expected to do things like take out the garbage and clean the toilets.

22.     Similarly, Gurjar too was fulfilling duties and responsibilities outside the scope of her role, including tasks way beyond the Kitchen. She regularly performed many tasks that fell under the role of Food Editor (i.e., what Tane had been hired to do) as well as Art Director, a role most closely held by Giora Stuchiner, the then-Studio Manager. However, Plaintiffs noticed that the

Resnicks were reticent to overwhelm Tane and Stuchiner, and often assigned their tasks to Plaintiffs. It became evident to both Plaintiffs, and many of their colleagues, that they were expected to work significantly more than the rest of the team. Brand new at their jobs, and the only two employees of color on the team, Plaintiffs attempted to keep their heads down and complete their work.

23.     In November 2018, Stuchiner was promoted to Art Director.

24.     In December, Feedfeed hired Jake Cohen as Editorial Director, to whom both Plaintiffs would now report. Though Senior Food Editor, Molly Adams, was considered for the position of Editorial Director, she was passed over for the promotion in favor of the outside male candidate. The Resnicks told employees Adams was not offered the job because she had a young toddler and that she had "chosen family" over the company.

25.     Stuchiner was rude and unpleasant to many, but he consistently singled Plaintiffs out for the worst of his verbal abuse. For example, in one early incident, Stuchiner asked Henry-Bohoskey (the only Black employee), in front of everybody, "why do Black people get so offended over watermelon?"

26.     Henry-Bohoskey reported the "watermelon incident" to Cohen, assuming he would agree that it was inappropriate, and perhaps speak with Stuchiner. Instead, Cohen told her to "ignore it."

27.     As another example, Stuchiner regularly referred to Bushwick, a historically Black and Hispanic neighborhood where Feedfeed's office is located and where Henry-Bohoskey resided, as "sketchy." Henry-Bohoskey took offense, and explained to Stuchiner that it was racist to call a neighborhood sketchy just because it is predominantly Black and brown. Stuchiner ignored Henry-Bohoskey's discomfort, and continued to refer to Bushwick as "sketchy."

28.     On March 5, 2019, Stuchiner and Dan Resnick created a video for Feedfeed's Instagram page which openly celebrated Bushwick's gentrification by white newcomers as if it were a saving grace. A number of Instagram commenters voiced their objection to the video in the comments section. Stuchiner doubled down, arguing with the commenters, insisting that Bushwick was indeed "sketchy" and should be grateful for gentrification. Henry-Bohoskey was so offended by Stuchiner's racist attitude and argumentativeness that she decided to bring it to Julie Resnick's attention. Sadly, Julie simply laughed in response and then quickly changed the subject.

29.     Likewise, Stuchiner routinely humiliated Gurjar by screaming at her in front of clients, interns and the entire editorial team, at events and elsewhere.

30.     A brief moment of optimism that Cohen might help thwart his behavior led to the sinking realization that Plaintiffs would have no recourse, as Cohen became an immediate and active participant in the abuse.

31.     For example, when they first met, Gurjar helped Cohen pronounce the name of an Indian dish he was struggling to pronounce. He called her "honey" and asked angrily, "I know lots of words *you* can't pronounce. Shall we go through all of those?" This would be the first of many times Cohen ridiculed Gurjar's English and grammar, in front of her co-workers.

32.     Thus, instead of helping, Cohen joined Stuchiner in mistreating Plaintiffs. Plaintiffs' colleagues regularly commiserated with them, having noticed that they received much worse verbal abuse and mistreatment than any of their white peers. Cohen and Stuchiner often screamed their names from across the room, ordered them to perform menial and degrading tasks, and unfairly blamed and chastised them for others' responsibilities.

33.     Rachel Givens, a white manager, also treated Plaintiffs in a demeaning and disparaging manner. For example, Givens routinely treated both Plaintiffs as though they were servers at a restaurant. She never afforded Plaintiffs the modicum of respect she gave to all of their white peers. When clients visited the Test Kitchen, Givens introduced all of her white colleagues by name and title; shockingly, she introduced Gurjar as "just someone who works in the kitchen". Givens' humiliating treatment of Gurjar persisted throughout Gurjar's entire tenure.

34.     In March 2019, another Black employee left Feedfeed after only four months. In her exit interview, the Black employee told multiple Feedfeed managers that she felt uncomfortable as a Black employee at Feedfeed. She reported Cohen's racist comments and general disparate treatment of Black employees at Feedfeed.

35.     Upon information and belief, Feedfeed took no action whatsoever in response to the outgoing Black employee's complaints of racism within the company. Certainly, Cohen, Stuchiner, and Givens continued to mistreat Plaintiffs, who also continued to receive more work assignments and less pay than their white colleagues, throughout the remainder of their tenure.

36.     Meanwhile, the Resnicks appeared to come to the realization that Stuchiner's photography skills were not what they hoped. In February 2019, the Resnicks asked Gurjar to help with some Art Director duties. By March 2019, Gurjar was performing 70% of the photography, styling, and creative direction for the company – with no additional pay.

37.     On May 6, 2019, Gurjar had her first annual performance review with Cohen. Not surprisingly, her performance merited only positive feedback. She was well-known amongst the staff as the best photographer at Feedfeed and had been doing great work for everybody. However, Cohen told her that she was not eligible for a raise and would not be eligible for

another six months. He claimed that because her prior supervisor, Adams, had been working

remotely, that the quality and quantity of Gurjar's work could not be verified.

38.      In fact, Cohen had not bothered to speak to Adams about Gurjar's performance at all.

39.      Cohen told Gurjar that she would be eligible for a raise six months later. Gurjar pushed

back, and he acquiesced to a three-month period, but insisted upon adding even more duties to

her plate and monitoring her performance.

40.      Throughout the summer of 2019, Stuchiner's and Cohen's abuse continued. In June,

Stuchiner screamed obscenities at Gurjar for accidentally touching a flower arrangement during

cleanup, in front of the entire team. Another time, he loomed over Gurjar, sizing up her physical

stature, and sneered, "are all Indians this short, like you?" Plaintiffs regularly received supportive

comments from many of their colleagues who noticed how much worse Plaintiffs were treated

than everybody else.

41.      In July 2019, there was a miscommunication between Givens and another Feedfeed

manager regarding scheduling of a professional organizing event at the test kitchen, which was

Gurjar's responsibility to oversee. Givens blamed Gurjar, who had nothing to do with the

scheduling error; when Gurjar attempted to explain what happened, as the details should have

been shared with her, Givens snapped that it was "none of your concern!" Gurjar simply put her

head down and walked away while Givens followed her into the kitchen saying, "whatever that

attitude was about, we are going to need to address it." Neither Givens, nor anybody else ever

treated any of the white managers in such a demeaning and humiliating manner.

42.      Meanwhile, in the summer of 2019, Henry-Bohoskey notified Cohen that she was

pregnant. As soon as she told Cohen, he immediately began pressuring her to tell Julie Resnick

right away, saying she would be "upset" if she heard the news from someone else. Her annual

review was in August; she asked for the title of Social Media Manager or Food Editor – both roles she had been fully performing – and a salary increase to $60,000.

43.     Cohen said she was doing a great job but refused to give her either title. Instead, he gave her the title of "Community Food Editor" and a $5,000 raise. Cohen promised that he would soon implement a bonus structure based upon her growth of Feedfeed's online audience. However, although she quickly almost doubled followers and engagement across all social media accounts, the bonus was never implemented.

44.     In September 2019, Henry-Bohoskey miscarried. She approached Cohen again, as she had been too fearful of her job security to press the issue of her salary while pregnant. She explained that she had taken the small raise because she was pregnant and felt like she couldn't ask for more, that her bonus structure had never been implemented, and that she needed more money to remain with the company, especially given the long hours she continued to work. Cohen simply ignored her and refused to engage her on the topic.

45.     Plaintiffs later learned that Cathryn Greenwald, a white woman hired just several months earlier, had approached the Resnicks during this same time for a salary increase. Unlike Henry-Bohoskey's request, Greenwald's was promptly granted.

46.     In early fall, Gurjar mentioned during a casual chat to Cohen and Adams that she was considering having children sooner rather than later. Cohen admonished her that "now is not the time to have kids."

**Abuse and Mistreatment Escalates**

47.     Throughout the fall of 2019, Feedfeed held multiple special events per week. Cohen and Stuchiner joined forces to become particularly abusive to Plaintiffs during these events. They

regularly singled Plaintiffs out for ridicule, screaming and berating them in front of the entire team and scapegoating them for anything that went awry, humiliating and bullying them.

48.     By October 2019, Cohen had informed Gurjar that the Resnicks wanted her to perform 100% of the Art Director duties. Yet, she still was not offered the Art Director title, nor any increase in pay whatsoever.

49.     Plaintiffs continued to be required to perform a variety of menial and demeaning tasks. For example, Plaintiffs were responsible for moving two to four enormous black garbage bags full of trash every day down the stairs and to the trash area approximately 40 yards from the building.

50.     Plaintiffs were expected to perform most of the cleanup after events, although it was not within either of their job descriptions. Other employees noticed how inappropriate it was that Gurjar was having to wash dishes herself, something other Managers were seldomly expected to do. Until March 2020, Feedfeed had insufficient hot water, meaning Plaintiffs often had to stay as late as 11pm hand-washing dishes in painfully cold water, including large serving platters, pots, pans, stemware, and other fragile items.

51.     Both Plaintiffs regularly worked grueling hours throughout that winter, often twelve to sixteen hours per day without overtime compensation. They had no support.

52.     Plaintiffs were often subject to additional humiliation in the form of being expected to perform other personal menial tasks. Indeed, Cohen demanded Plaintiffs clean up his personal dishes in the kitchen on a daily basis. He cooked personal meals for himself, leaving his dirty pots, pans, and dishes out for Plaintiffs to wash, dry, and put away, as though they were his personal maids. Such tasks fell nowhere within Plaintiff's job duties, yet Plaintiffs were admonished when these dishes were left dirty.

53. Plaintiffs were essentially treated as the office maids. As their job duties and their out-of-scope duties continued to pile up, Cohen continued to dump more and more on their plates. Gurjar told him once that she didn't physically have the bandwidth to do everything he wanted her to do. A few hours later, Julie Resnick called her to chastise her, saying, "we don't say that at FF," a sentiment she often repeated throughout Plaintiffs' tenure.

54. Plaintiffs also suffered frequent misogynistic comments by Stuchiner. He repeatedly complained that menstruation was "disgusting" and one time flew into an open rage, in full view of the staff, upon the mere sight of a tampon wrapper in the unisex restroom can.

55. During setup for a Feedfeed event on December 12, 2019, Stuchiner approached another woman on the team, former account manager Amanda Meier. He screamed obscenities at her, chastising her for a perceived mistake, and yelled at her: "Why don't you let the clients bend you over and gangbang you?"

56. Gurjar complained about this incident to Cohen, who simply told her to "ignore it."[1]

57. Cohen and Stuchiner learned there was no accountability for their behavior whatsoever, and Plaintiffs continued to suffer without recourse.

**Plaintiffs' Formal Complaint of Racism**

58. On February 26, 2020, at 9:19 a.m., Gurjar sent an email to the Resnicks, with Henry-Bohoskey, Tane, and Rachel Dolfi, the Assistant Food Editor, copied, which said:

> We are writing this letter to lodge a formal complaint against our boss Jake Cohen for bullying, unwanted conduct, nitpicking, casual workplace racism, and poor management which has led to a hostile, oppressive and intimidating work environment.

---

[1] On February 20, 2020, Feedfeed distributed its first employee handbook. Dan Resnick summoned Gurjar to a meeting where he and Cohen informed her the overtime law had recently changed, and that she would receive a marginal salary increase, from $57,000 to $60,762, to make her exempt from overtime. The Resnicks' understanding was wrong, insofar as the belated increase did not exempt her; neither before nor after the increase did she work in a "bona fide executive, administrative, or professional" capacity. N.Y. Comp. Codes R. & Regs. tit. 12, § 142-2.14.

59.    The email described Stuchiner's gangbang comment, his "are all Indian people short like you?" comment, the watermelon remark, the tampon outburst, and many other examples, along with Cohen's latest racist anti-Asian remark:

> Casual workplace racism – During the peak of coronavirus scare, during work hours Jake said 'OMG! I am so scared I am going to get the coronavirus because I have so many crazy rich Asians living in my building who keep getting packages from Korea and China!!' He said this in front of our kitchen intern who is a Chinese immigrant. This incident was extremely uncomfortable to witness as an immigrant myself.

60.    The email continued:

> We want to be perfectly clear that this is not meant to be an attack but to try to remedy the situation and help create a more effective and nurturing work environment for our team. We love working at the Feedfeed and wish to continue to create amazing content and to grow with the company.

61.    At 9:21a.m., Dolfi replied to the email, saying: "I attest to witnessing these statements above and support these claims entirely." At 9:22 a.m., Henry-Bohoskey replied: "I attest to witnessing these statements above and support these claims entirely." At 9:25 a.m., Tane replied: "I can attest to witnessing these statements and fully support the claim."

62.    The next morning, Dan Resnick called Gurjar on the phone to discuss the complaint.

63.    Dan painted the complaint as a personality conflict, for which both sides – Cohen and his reports – were responsible. He repeatedly tried to change the subject to random perceived performance deficiencies by Cohen's reports, insisting that Cohen's comments and behavior were justified as a result. He insisted, repeatedly, that Cohen was not the only person whose behavior needed to change:

> I mean, the gist is that we feel like there's potential personality conflict, but that nothing Jake has sort of reached a level of abusive as much as being a stern boss…
> I would like to just request that you do your best to just try to be as civil and professional as possible. . . I'd like to think that we can . . . move past what you described, to whatever extent, or to whoever's sort of at fault. But in whatever ways people have to change, I'd like to think it can be a group thing and not something that only one person has to change . . .

And because of the nature of your complaint and the way that the whole editorial team . . . it does risk it becoming a little bit of a ganged-up scenario. . . I'd like to sort of avoid . . .

Maybe certain responsibilities that you're doing are not ideal for you and maybe that's causing some tension. And maybe certain expectations that he set were a little bit too accelerated and didn't provide you enough context and that's why there's been some tension. . .

64.     Gurjar tried valiantly to explain that the situation had nothing to do with her or others'

inability to take criticism or feedback, and that it had nothing to do with performance

deficiencies:

[W]hen I do make a mistake telling me that it was wrong or reprimanding me, that's not the problem at all. Several other people have done it in the past, and I'm totally okay with that because I don't want to make that mistake again. And I want to be a better employee and I want to work hard for Feedfeed and I want to give my everything. But it's the way that things are delivered and I definitely felt singled out and other people also came and asked me, 'What is, what's happening? Why? We feel like you're being singled out. Are you okay? What's going on?' So first I thought it was just me thinking it, but other people were noticing it too. So, it's not that I mind someone telling me, 'Oh you made a mistake.' Because I would never grow as an employee, as a person like that. It's just the way, the tone, the nature, they're not caring about somebody who I've gone above and beyond for as a manager for the past year, and Dan, I have. Whether it be events, whether it be coming early, staying late, anything, I have done it for him.

65.     However, Dan ignored Gurjar and continued:

Let's dig in a little bit to why he has a negative approach to that. . . Everyone has things that they're excelling at right now and everyone has things that they can improve on . . .

. . . I'd like to think that it goes both ways, that the communication hasn't been ideal but the execution at times maybe was not as proactive. I'd like to think you can leave yourself open to things sort of improving on all fronts, both from the managerial side but also from your own side and that we can just have a positive way to move forward.

66.     Dan actually went so far as to suggest that Cohen's behavior was excusable because it

was triggered by negative body language he was experiencing from his reports:

Resnick: You have one manager that you have in common, and then you're all feeling something similar, so I just want to make sure that there isn't, that you don't then react to that and create more sort of tension from your side. The more you can -

13

Gurjar: I mean obviously there is a dynamic and a power play. From what I know Sahara is never going to be rude, nor is [Rachel Dolfi], nor is [Sara Tane], nor is me. We're all very professional, so I have never seen anyone, any of them be rude to anybody else let alone Jake, who is our manager.

Resnick: I guess I didn't mean overtly I just meant... There's so much in the way of body language and the way you say something that's not overtly... I just meant like, with the intention of hitting a reset button, I think it's important to be open to... Look there are things that Jake's going to change, and I just want to make sure that you're open to accepting those changes as sincere changes and also the other way around…

67.     On March 3, 2020, Dan called Henry-Bohoskey to discuss the facts of her complaint.

68.     The primary goal of Dan's call appeared to be securing a statement from Henry-Bohoskey that she felt comfortable continuing to work with Cohen. After asking her multiple times, and realizing he was not going to get the response he presumably wanted, he stopped asking. Dan had apparently done the same thing with Meier, as he represented several times that Meier stated she felt comfortable continuing to work with Cohen, as evidence that Feedfeed need not take further action. Notably, Dan refrained from asking Gurjar the same question on his call with her.

69.     Dan repeated his concern that the situation was somehow "four against one" and, again, pivoted the conversation to the job performance and perceived mistakes of Cohen's reports throughout the call:

Some of the pressure that you guys have felt has been difficult and the form by which some of the feedback that you guys get, isn't always appropriate … Some people make more mistakes, with certain things people make more mistakes than others. And then, I think there is also a factor that the company is such that people are doing things they haven't necessarily done before. . .

Some mistakes are different than others. . .  everyone makes mistakes, so that's the concept that is accepted obviously in workplaces. So, we just have to figure out how to address situations that are a little bit more repeated mistakes differently than one off mistakes . . .

70.     Dan never contacted Dolfi or Tane about the complaint.

71.     In the days following these conversations, Cohen became even more openly hostile toward Gurjar and increased her workload.

72.     At the onset of the COVID-19 pandemic, in March 2020, Gurjar became extremely ill. Cohen forced her to continue coming into the office, even while sick, although all other employees were permitted to work from home. He refused to grant her sick days, chastised her for missing work, demanded she work on her days off, and included tasks such as fixing the office toilet. None of Gurjar's white colleagues, let alone any other managers, experienced similar mistreatment. Both Cohen and the Resnicks pestered Gurjar regularly for an accounting of her symptoms and to see when she could return to resume shooting in-person at the studio. This unwarranted pressure from Gurjar's managers was especially shocking as Governor Cuomo had at this point ordered all non-essential in-person business to cease, for serious safety reasons.

73.     Additionally, in March 2020, Stuchiner was laid off. Gurjar was instructed by Feedfeed to continue to perform his duties, in addition to her regular responsibilities, without additional pay.[2]

74.     Similarly, in March 2020, full-time Editorial Assistant Sara Linder resigned, rather than replace her, Feedfeed simply tasked Henry-Bohoskey with absorbing Linder's workload, at no additional compensation. It would be yet another occasion that Feedfeed expected its employees of color to absorb significant additional workload and responsibilities, without pay.

75.     In April 2020, Tane was laid off. Yet again, Feedfeed expected Henry-Bohoskey to simply absorb most of her workload, at no additional compensation.

---

[2] Though Feedfeed has since claimed, in communications with counsel, that Stuchiner was removed from his position due to his inappropriate behavior, that certainly was not the story told at the time. Instead, Feedfeed sent out a company-wide email lamenting the loss, describing it as a "VERY difficult decision," and explaining that it was solely for financial reasons.

76.     At this point, thus, Gurjar and Bohoskey were both performing the work of multiple full-time employees, and facing extreme negativity, verbal abuse, humiliation, and disparate treatment from their direct supervisor.

77.     On April 23, 2020, Gurjar wrote to Dan Resnick:

> Since our last call, the situation has not changed and in-fact things have only gotten worse than they already were. Everyday I clock into work feeling extremely stressed and anxious about how I am going to be mistreated by my manager. I am in a constant state of anxiety and even though we are not physically going into the studio, the environment continues to feel toxic and unsafe. This has taken a serious toll on my mental, physical and emotional well being. I love the work and Feedfeed but honestly do not know how long I can continue to survive this and operate in any capacity at this company.

78.     Dan replied asking for examples. He represented that "[b]ack in February, we did a full investigation and had conversations with many members of the team and were under the impression that things were moving forward more amiably." He did not explain what had created that impression, given that he had done nothing but chastise Plaintiffs for complaining, and had neglected even to speak to the other complainants. He concluded the conversation by conceding that there had been some negative interactions, but that Gurjar was overstating the problem.

79.     In one instance, in May 2020, Cohen asked Gurjar to create a video, in the middle of her packed day, that emulated a TikTok video in which a woman was dressed extremely provocatively. She responded on the public channel:

> Hi @Jake, thanks I just looked at it. So doing full makeup and hair takes at least 2.5 hrs and I still have lots of work left on my to do list for the day. Also I don't think I am comfortable doing that concept. Happy to do a quick recipe or the ugly photos one today.

80.     Cohen demanded she speak to him privately about it, forcing her into an uncomfortable conversation. When she raised the issue with Dan, he suggested she should raise these issues with Cohen publicly; then suggested actually that it was not a good idea; then said she should bring the issue to his and Julie's attention, before conceding that also wasn't a good approach;

after chastising her, multiple times, the "negative" tone of her response to the inquiry (via online messaging):

> I guess the only way we could figure this out is just to take a pause whenever there's any sort of feedback that you feel like you need to give, or he needs to give, and just determine the best way to give that feedback in both ways. I don't know how else to do it other than we're all on the public channel. . . .

> But that exchange in itself, I would say from an outsider perspective did look like you were annoyed and standing your ground. And potentially, if I'm your manager, I realize, "Oh, this is a sensitive issue for her, but she is reacting kind of negatively." . . .

> . . . Now that you're bringing this up, your reaction did have a negative tone.

> . . . In my mind I'm like, "Oh, I'm sure Jake will feel like you're being negative, but I'm sure there's also something on your side."

81. Dan finally concluded,

> **"I guess the answer is you need to feel comfortable to actually voice your feelings in a way that elicits compassion, rather than what it's currently eliciting."**

82. Gurjar left the exchange disheartened by the repeated tone policing, only having learned saying "hi, thanks . . . I don't think I am comfortable doing that concept" would be met with opprobrium and characterized as unduly negative.

83. Gurjar was due for her annual review in May. Adams, who was highly familiar with her work, had suggested to the Resnicks that Gurjar deserved the Art Director title.

84. The Resnicks disagreed; they explained that they thought of Gurjar as a staff photographer and stylist (lower titles than she held). They also denied Gurjar's request for a modest raise.

85. Julie Resnick explained:

> Since you have only recently transitioned to having you shoot and style still and video images we'd need for you to be in your current role for at least 6 months before we could evaluate if you are able to take on a more senior level role as an art director . . .

86.     Consistent with the racially disparate treatment Plaintiffs experienced throughout their tenure, this was a goalpost change. When Stuchiner had received the Art Director title in November 2018, after less than a year of employment, he had edited about 100 photos, about 40 recipes, and taken about 1,000 photographs. Gurjar had over three times his experience at this point; she had edited over 600 final photos, 180 recipes, and had taken over 2,500 photographs for them – all in addition to her regular job duties and without any compensation.

87.     Though the timing was bizarrely late, the Resnicks did, at least, temporarily permit Gurjar to report to Adams instead of to Cohen.

### #BlackLivesMatter: Tokenism and Hypocrisy

88.     After the murder of George Floyd in late May 2020, and the ascension of the #BlackLivesMatter movement, there was a racial reckoning within many industries. Racism within the food community became a topic of public discussion. Feedfeed suffered widespread criticism for its tendency to promote only white influencers, content creators and chefs, and to whitewash traditional ethnic dishes by featuring white chefs and influencers with inauthentic recipe versions. Several Feedfeed employees on the edit team made similar complaints to the Resnicks.

89.     In response to these criticisms – specifically, Feedfeed's posting a Jerk Chicken recipe featuring a white man – on June 2, 2020, Dan wrote over Slack:

> I want to make the point that we re [sic] not going to stop posting multicultural food by people outside of the culture that is responsible for the cuisine. A culturally appropriate recipe does not need to be made by someone from that culture. That is a barrier that we do not want to erect. If a white person makes something that is representative of a story we want to feature, I do not want to shy away from that.
>
> While we can and will of course aim to tell more and more stories and feature recipes by people of diverse backgrounds, I would not characterize our site or feed as one that is overtly NOT diverse.

In summary, Rachel [Dolfi], I do agree with you, but the execution of how we move forward will be subtle, it will be complex, and it will require finesse. If any of you do feel like our feed or site are not diverse, I would like to ask the question why that is the case. Not an easy question, but happy to have the discussion in a time that we all should create opportunities for conversations that may feel uncomfortable at times.

90.     A few days later, perhaps chastened by the increasing public pressure, Dan changed his

tune somewhat, and sent a team-wide message highlighting Feedfeed's efforts to achieve racial

equality. He mentioned that Feedfeed had donated $500 to a project aimed at combating food

inequality and pledged that Feedfeed would support BIPOC creators going forward. He wrote

that, "when Feedfeed sees significant growth again, future hires will incorporate the need for

more diversity in our staff." However, Dan then continued:

We are a company that has supported BIPOC content creators before, this is nothing new. We are not jumping on the 'bandwagon' all of a sudden. #Feedfeed was designed to provide opportunities for everyone.

If you have any issues with our approach, please do let us know so we can incorporate your views, but this is a time that we need everyone on the team to be on board and support these efforts with a unified voice.

91.     Feedfeed did take one concrete step in response to the #BLM movement: demanding that

Henry-Bohoskey take a more public and active role in its videos.

92.     On June 4, 2020, Molly Adams questioned whether it was appropriate to burden

Feedfeed's only Black employee with extra work, in an effort to appear more racially egalitarian.

Dan Resnick responded via Slack message:

[I]f we truly believe that we want non-white talent, I think we are 100% within our right as a company to request that Sahara shoot it as an example. The world wants food media companies to rightfully hire more diverse staff. We have that diversity.  So why would we not be leveraging it. It is not as if she has not been talent before.

93.     That same day, Dan Resnick sent both Plaintiffs individual Slack messages offering "an

opportunity to discuss your feelings 1:1 about the current state of the world, how you feel about

[Feedfeed's] plan moving forward, and your overall feelings about being a Person of Color on our editorial team." To Gurjar, he added, "Just here to be supportive."

94.     Plaintiffs were dumbfounded. It was as though they had not been complaining about both explicit and implicit racism and mistreatment throughout their entire tenure. Furthermore, their complaints had not just been ignored but they had suffered retaliation for raising them to management.

95.     Henry-Bohoskey responded, "I am happy to get on a call with you, not sure it will shed any new light as we've discussed a lot already before George Floyd on the problems we've had at FF."

96.     Thus, on June 24, 2020, at the Resnicks' request, Henry-Bohoskey met with Julie Resnick to discuss these issues, where she summoned the extraordinary courage to address the race-based disparities between herself and her colleagues specifically.

97.     She created a lengthy list of all of the responsibilities she had been handling at Feedfeed. She explained that she had seen her white peers move up faster than her, and that as she was reading literature about racism and Black Lives Matter, she realized she was being undervalued as compared to her white peers:

> I started to see some parallels of certain coworkers or allies that have moved up much faster than I have. And I realized that I've been quite stagnant …the main points that for me that kind of gives me a heavy heart when I think about is if I compare myself to Alex who deserves everything. And there's nothing that I would ever bring her down on. But I can't help but to compare that she and I started two months apart. But she is now the VP or co-VP of production. And I last year asked for a social media manager position and that way I could hone in on the avenues that I really enjoy, which is analytics, creating content and sharing content. And that wasn't quite granted. . .
>
> … I don't really know how I feel about making this content that I feel very tokenized right now . . .

I mean, when I say that, it's not in a very sharp tongued way; it's a fact that I'm the only Black person at the company. And I guess it all stems from the layers of the fact that I understand that you might not see the parallel of Alex and I…

It's also obvious to me that, for the most part, I think the whole like OT conversation was just me. So that, to me, shows also that I'm one of three lower paid people at the company as well, which then clicked to my mind. I was like, well, Catherine came later than me, and she's the same age as I am, and does quite similar work in social.

And …then realizing… my pals Alex and Cathryn, you know, it disheartened me thinking that because I do feel like I bring just as much value to the company as them. I'm not going to say more because I think we're all equally amazing, but I just, I want to also have that, the feeling of also being valued equally with them. . .

You know, the last couple of weeks of getting all those DMS that we were getting and those comments, and, …I did see that… there's a calling out of what we do have, you know, POCs working on our team, which is like, you know, valid. It's true. But then to also look at the other side of it, of seeing that the two POCs that we are crediting and showing that we are inclusive are also being the two lower, lowest paid people in the company. And that to me is a little of an indication of us also not advocating for ourselves and also not having an environment where we feel like we can do that . . .

98.     Dan tried to summarize what she was saying as "more of a personal feeling that like in this environment, you feel a little bit strange creating content," rather than acknowledge that Feedfeed had explicitly sought to increase Henry-Bohoskey's public presence as the company's only Black employee. She pointed out that the two people of color being publicly credited were among the two lowest paid people in the company, although they had more seniority and experience than many others.

99.     Dan stated that he "strongly disagree[d]" with Henry-Bohoskey's statement that she was feeling tokenized. He complained that it "dishearten[ed]" him to hear it. He protested that they had never put pressure on her to create content and said, "in this environment right now, I find that to be like a very sort of slippery slope to make those statements." (The position the Resnicks took on this call was that they had simply been asking many different employees to increase

video production.) He then reminded her not to "vilify" Cohen and instructed her to "be careful" about who she blamed, whether Cohen or the Resnicks.

100.    It was a stark contrast to his public statements.

101.    In response, Henry-Bohoskey asked for a promotion to the title of Social Media Manager, commensurate with the work she had been performing. The Resnicks refused, insisting that she was "underqualified." Unbelievably – especially in light of their refusal to give raises – they immediately proceeded to create a job posting on LinkedIn, seeking a social media manager with the exact level of experience Henry-Bohoskey had!

102.    Henry-Bohoskey wrote to Dan, asking why he had deemed her underqualified when she had the same level of experience they were seeking. He quietly edited the job posting to call for slightly more experience.

103.    In early July 2020, Gurjar renewed her request to be promoted to the title of Art Director and to be paid commensurately.

104.    On July 16, 2020, presumably in an effort to avoid promoting Gurjar, the Resnicks created a new organizational chart, with newly created salary tiers. However, on the chart, Gurjar no longer appeared as a "Manager" but had been demoted to "Specialist," the level beneath "Manager." It was clear to Gurjar, and her colleagues, that the chart effectuated her demotion.

105.    That day, Cohen and Adams called Gurjar to discuss the restructuring and her new role. In response, Gurjar complained explicitly that the company's failure to promote her, and instead demote her, appeared to be discriminatory, stating these adverse actions were based on her being "a woman of color."

106.    The following day, July 17, 2020, in a call with Gurjar, Cohen, Adams, and the Resnicks intended to address Gurjar's race-based complaint, Julie attempted to coach Gurjar into stating

that her complaint was based on her "frustration" as opposed to a genuine belief of discrimination. In response, Gurjar reaffirmed her complaint "is not out of frustration, that is what [Gurjar] believes."

107.  Gurjar then requested to know what qualifications Stuchiner possessed to qualify for the Art Director position the company refused to give her. Julie responded that she didn't "think that was relevant" and would not engage in the conversation.

108.  Gurjar then turned to her demotion, asking why the reorganization placed her in what appeared to be an entry level position. To this, Julie stated Gurjar was being "bogged down by words." Cohen then echoed Julie's comments stating Gurjar was "dealing with semantics."

109.  There was no explanation for the demotion other than that the Resnicks remained angry that Plaintiffs had continued to tell the truth about the racism they were both experiencing.

110.  When Gurjar asked what she would need to achieve to be restored back to the "Manager" tier, Cohen told her that she needed to have at least one direct report: a circular explanation which prevented her reinstatement to her former title.

111.  Throughout the call, instead of acknowledging Gurjar's complaint of discrimination, Julie repeated her insistence that Gurjar was not qualified for Stuchiner's former role, although she admitted to having no knowledge of Gurjar's level of skill or experience with photography. She also proceeded to repeatedly insist that Gurjar was "frustrated," – even though Gurjar repeatedly insisted she was not, and said:

> Honestly I need to better understand if you would prefer that we help you to move on and look for another job because it doesn't feel that you are going to be able to get past your frustration.

112.  Julie Resnick's insistence that Gurjar herself was simply suffering unplaceable "frustration," that she had no capacity to address, would be insulting in any circumstance; but

especially here, where both Plaintiffs had expended so much effort in pleading over and over again with the Resnicks to treat them equally and to stop the racist and sexist harassment they had suffered at the hands of not one but multiple other individuals at the company.

**The Resnicks Force Both Plaintiffs Out**

113.    In early September 2020, Cohen voluntarily left Feedfeed for another opportunity. The Resnicks now became hypercritical of Gurjar, micromanaging her every move on shoots, forcing multiple reshoots, and undermining her by changing entire concepts mid-shoot and demanding props and ingredients not previously discussed.

114.    The Resnicks' behavior on these shoots was so hostile and distressing that Gurjar began calling Dolfi in tears on a daily basis, sometimes multiple times per day. Twice, she woke up in the middle of the night screaming.

115.    Meanwhile, Andrea Loret de Mola, a white Associate Food Editor with far less skill or experience than Gurjar, received little or no criticism in connection with her shoots, which the Resnicks readily accepted without requesting reshoots or demanding conceptual changes.

116.    Gurjar also started treatment by a psychotherapist in October 2020 in order to cope with the emotional distress she was experiencing at work.

117.    It appears that the Resnicks decided to escalate their harassment with the purpose of forcing Plaintiffs out. They even began the process of replacing them.

118.    In October 2020, Feedfeed hired Alexa Santos, a white woman, as another Food Editor. Although she had no work experience in the culinary industry, and very limited experience in food media, Santos was paid a starting salary of $65,000 – a salary it had taken Gurjar two years to receive.

119.    On November 18, 2020, Plaintiffs were summoned to separate video "check-in" conferences with the Resnicks, Adams, and Feedfeed's new Human Resources consultant, Angie Buonpane.

120.    The vast majority of the call was spent chastising Henry-Bohoskey for having inadvertently expressed frustrations at time-sensitive, emergency demands from the Resnicks, which they had sent to her with clearly no understanding of how laborious they were, and which she literally could not fit into her packed day. The criticism was *not* that Henry-Bohoskey had failed to complete these tasks, but rather that she had failed to hide her frustration at the difficulty of having to field the requests and criticizing her for feeling like she could not get everything done that was on her plate.

121.    Both she and Adams tried to explain to the Resnicks how packed her days were and that there was only so much she was able to physically do in a particular timeframe. But the Resnicks refused to listen; they simply repeated that "as the founders" they were entitled to have these requests honored without any perceived negativity in the response.

122.    The Resnicks repeated that, by not being able to accomplish every single task they piled on her, Henry-Bohoskey was "creating an us versus them scenario." They accused her of failing to be accommodating; of having responded in a contentious and/or hasty manner; and even chastised her for asking, politely, to come to her in advance with last minute requests. Referring to one such instance, Julie argued that "it just didn't seem like a big deal to ask you" to complete this large task that Henry-Bohoskey had no room for in her otherwise-packed day, although she still got it done. They chastised her tone – repeatedly – as negative and abrupt, ignoring Adams' and Henry-Bohoskey's protestations that they were fielding hundreds of other Slack messages at a time and that tone is difficult to read on there.

123.    Of course, the Resnicks were still not paying Henry-Bohoskey for the many long overtime hours she continued to spend.

124.    However, the tone-policing itself was not the bombshell. That came at the end of the call, from Dan, who then proceeded to criticize Henry-Bohoskey for having asked, politely, on a prior call, if one of the new hires was a person of color. Dan described the question as "accusatory" and as "an attack":

> When we were mentioning bringing on another social media manager, Nancy, at the time you mentioned something along the lines of you really wanted to make sure that it was a person of color, and that intention to focus on diversity, but it did again, come off more accusatory. . . *It really is difficult for us as founders, who are trying to do as much as we can in this realm.* It felt a little bit like you were questioning our approach and intentions in this regard. And if you do have any concerns about our, I guess, focus and desire to make sure to support being more diverse in any way we can, please do discuss it with us and Angie, but at that time it did feel like a little bit of an attack at a time when we were doing as much as we could, and really there was no indication that we weren't . . . .

125.    Henry-Bohoskey was, again, simply dumbfounded. It was as though none of the conversations over the several years prior had transpired. It was clear that the Resnicks had made zero efforts to take any basic steps to ameliorate the shameless racism and retaliation to which they continued to subject Plaintiffs.

126.    Henry-Bohoskey's purportedly objectionable inquiry had been, in its entirety:

> I know when we had our last chat, I did suggest that I think it will be really important for us to… diversify a little on our team. And I think Nancy could be a great person, I haven't met her. But are we taking that into account of making sure that we're adding people to our team to make it a little bit more equitable and inclusive?
>
> (Dan: Well, I'm not sure if you sort of looked into Nancy, but she is a person of color and I believe so is Alexa, who would be coming on with a history of journalism and doing talent.)
>
> Okay. That's fine. I just wanted to double check and share that concern.

127.    Alexa Santos was not a person of color; but worse than Dan's lie, Feedfeed had not actually finalized Nancy's job offer! When Nancy expressed that the salary offered was

inadequate – upon information and belief, an amount less than Santos was offered – she was berated as "unprofessional" and opted not to accept the job. As she later stated in an Instagram post about her negative experience being hired to work with an unnamed large food media company: "I should have picked up on the red flags during the interview process: immediately asking about how I felt on the current political issues and saying food isn't political."

128.    Upon information and belief, the Resnicks did not subject their white applicants to similar inquiries, nor did they berate their white applicants.

129.    Meanwhile, shortly before Gurjar's call with the Resnicks on November 18, 2020, she received a memorandum signed by both Resnicks. The document contained a "formal written warning" for various sponsored content posts she had made, something she had always done without incident, and which no formal or informal policy prohibited. However, it then went on to list a litany of complaints against her, none of which she had ever heard.

130.    The Resnicks claimed Gurjar – who by now, was crying almost daily, and whose hostile mistreatment by the Resnicks - which multiple colleagues had witnessed and affirmed– had "created a negative work environment by not fully supporting all of your fellow team members, disrespecting authority, and being a leader in turning people's positive sentiment about the brand and the company to negative." The memo falsely stated that Cohen had previously spoken to Gurjar about these issues, describing her as combative, disparaging, and having "refused to honor reasonable requests" which, as she had explained ad nauseam, were simply impossible to fulfill in light of her inhumane workload. Though no prior warnings, or indeed any negative feedback whatsoever had been given, the Resnicks concluded: "You should consider this memo to be a final warning and a performance improvement plan we expect you to adhere to."

131.    On the call, the Resnicks discussed these accusations with Gurjar. The call crystallized the completely pretextual nature of the Resnicks' complaints.

132.    The Resnicks did not, and could not, identify any examples of other employees who had complained about Gurjar.

133.    Though the "warning" accused Gurjar of refusing to send her daily to-do list, the Resnicks could not refute that in fact, she had stopped sending it because her direct manager had told her it was unnecessary. Julie sheepishly responded, "you can just send it going forward.

134.    Other white employees were not subject to this same requirement.

135.    The "warning" accused Gurjar of refusing to do more than one photoshoot per day. When she explained that she had never refused anything, but that in fact it was not physically possible, the Resnicks similarly backed down.

136.    The same was true of the social media postings Gurjar had done on her own time. The Resnicks left the call acknowledging that Gurjar was entitled to pursue her own brand on her free time, and vowing to find some sort of middle ground and to proceed with future conversations about it after having given it some thought.

137.    The Resnicks never followed through with their promise to give the issue more thought and convene a follow-up meeting. Instead, on November 30, 2020, they sent Gurjar another written reprimand, completely contravening the telephone conversation they had just had.

138.    Meanwhile, white Feedfeed employees continued to post sponsored culinary content on their own social media pages with no repercussions from the Resnicks. For example, the following week, on December 3, 2020, Dan Resnick told Santos (the new, white Food Editor) that her freelance food writing for Buzzfeed wasn't a problem. Cohen, Stuchiner and Tane had

all also posted sponsored content on their respective social media accounts, without repercussion – as Gurjar herself had done, before her recent discrimination complaints.

139.   *Every employee except for Gurjar was given a holiday bonus* (though, upon information and belief, Henry-Bohoskey's was less than others'.)

140.   By this point, the emotional distress Gurjar was experiencing due to this hostile work environment became a crisis. Though it had never been her intent, and she had no new job secured, on December 23, 2020, she resigned her employment out of emergent necessity.

141.   Henry-Bohoskey was more reticent to leave, as she was pregnant and was concerned about losing the paid maternity leave she was entitled to pursuant to the New York Paid Family Leave Act. However, the Resnicks escalated their mistreatment until it was similarly unbearable for her. In January 2021, the Resnicks chastised Henry-Bohoskey for using her earned PTO to take a brief vacation. Worse, upon her return, she found that the Resnicks had hired her replacement: a white woman with less relevant experience. The Resnicks intensified their hostile treatment of her: they criticized her work extensively and without cause, grasping at straws for any reasons they could find to criticize and belittle her. Henry-Bohoskey began to fear for her pregnancy as a result of the stress. Though it meant sacrificing her partially paid maternity leave, she resigned her employment on January 29, 2021, solely because of the anxiety that the Resnicks' harassment and mistreatment was causing her.

**Defendants Misclassified Plaintiffs and Failed to Pay them Overtime**

142.   Gurjar's primary duties were non-exempt tasks including, but not limited to: pitching recipes for campaigns; developing recipes; creating instructional recipe videos; food styling and photography; assisting in the setting up and breaking down of photoshoots; and fielding miscellaneous photoshoot or office-related requests.

143.    Henry-Bohoskey's primary duties were non-exempt tasks including, but not limited to: writing and editing social media content; managing and styling social media accounts; assisting in the setting up and breaking down of photoshoots; and fielding miscellaneous photoshoot or office-related requests.

144.    Plaintiffs' duties did not include hiring; firing; making recommendations for hiring, firing, or other employment decisions; disciplining other employees; formulating, affecting, or implementing management policies or operational practices; or planning long- or short-term business objectives.

145.    Plaintiffs' primary duties did not include the exercise of discretion or independent judgment regarding matters of significance, nor did Plaintiffs have authority to commit Defendants to matters of significant financial impact.

146.    During their employment, Plaintiffs were paid salaries far below the minimum threshold required to qualify as an exempt employee under the NYLL.

147.    Despite this, throughout their employment, Defendants misclassified Plaintiffs as exempt employees.

148.    Defendants informed Plaintiffs when they were hired that they would be expected to work Monday through Friday, 9 a.m. to 6 p.m.

149.    However, throughout the course of their employment, Plaintiffs were expected to work well above a 40-hour workweek.

150.    Indeed, seven-day workweeks and/or 12-hour workdays on various shoots were not unusual for them. Plaintiffs were also expected to be "on call" at home and often fielded calls and emails from Defendants from 7 a.m. to midnight. Feedfeed repeatedly told them "This is just

the nature of their business." Cohen even discouraged lunch breaks, or indeed any breaks, during the workday.

151.    Although Plaintiffs routinely worked more than 40 hours per week, Defendants never paid them an overtime rate of one-and-a-half times their normal rate of compensation for any hours worked over 40 in a week.

152.    Defendants were aware that Plaintiffs worked more than 40 hours per week, and yet Defendants willfully failed to pay overtime compensation. Instead, Defendants knowingly continued to pay Plaintiffs as exempt employees, in willful violation of the NYLL.

**Defendants Paid Plaintiffs Less Than Their Similarly Situated White Counterparts**

153.    Stuchiner is a white man with comparable experience to Gurjar, who performed comparable work. Upon information and belief, Stuchiner was paid a full-time salary, while Gurjar completed the same amount of work for no pay.

154.    Tane is a white woman with comparable experience to Gurjar, who performed comparable work to her. Upon information and belief, Feedfeed paid Tane over $20,000 more per year than it paid Gurjar.

155.    Greenwald is a white woman with comparable experience to Henry-Bohoskey, who performed comparable work to her. Upon information and belief, Feedfeed paid Greenwald approximately $10,000 to $12,000 more per year than it paid Henry-Bohoskey.

156.    Alex Steadman is a white woman with comparable experience to Henry-Bohoskey, who performed comparable work to her. Upon information and belief, Feedfeed paid Steadman approximately $15,000 more per year than it paid Henry-Bohoskey.

157.    Santos is a white woman with significantly less experience than Gurjar, who performed comparable work to her. Upon information and belief, Feedfeed paid Santos approximately $15,000 more than it paid Gurjar, for the equivalent level of seniority.

158.    Upon information and belief, other comparable white employees were also paid more than Plaintiffs, for comparable work.

### The Effect on Plaintiffs

159.    Plaintiffs' chronic treatment as second-class employees, who were inferior to their colleagues simply by virtue of their race and/or gender, was not only financially harmful, but utterly demoralizing and emotionally devastating as well. Plaintiffs have both been treated by mental health professionals for the lasting emotional impact of their discriminatory and retaliatory treatment by Defendants, including depression, anxiety, panic attacks, loss of self-esteem and loss of enjoyment. Plaintiffs have also experienced various physical manifestations of emotional distress including loss of appetite, weight fluctuations, hair loss and other dermatological issues, insomnia, and persistent nightmares.

### FIRST CAUSE OF ACTION:
### Discrimination in Violation of 42 U.S.C. § 1981

160.    Plaintiffs repeat and reallege each allegation above.

161.    Defendants unlawfully discriminated against Plaintiffs in the terms and conditions of their employment by, *inter alia,* subjecting them to disparate working conditions on the basis of their race, in violation of 42 U.S.C. § 1981.

162.    Individual Defendants are personally, directly and individually liable, in that they aided and abetted the corporate Defendant in its unlawful discriminatory acts against Plaintiffs, in violation of 42 U.S.C. § 1981.

163.    Alternatively, in terms of the economic realities of the workplace, Individual Defendants are personally, directly, and individually liable as employers for the unlawful discrimination against Plaintiffs, in violation of 42 U.S.C. § 1981.

164.    Defendants' unlawful discrimination against Plaintiffs caused Plaintiffs to suffer emotional and psychological distress, physical injury, mental anguish, loss of enjoyment of life, humiliation, embarrassment, pain and suffering, and economic damages.

165.    Defendants acted with malice and/or reckless indifference to Plaintiffs' rights, entitling Plaintiffs to an award of punitive damages.

166.    Defendants are liable to plaintiffs for compensatory and punitive damages, attorney's fees, and costs.

**SECOND CAUSE OF ACTION:**
**Retaliation in Violation of 42 U.S.C. § 1981**

167.    Plaintiffs repeat and reallege each allegation above.

168.    Defendants unlawfully retaliated against Plaintiffs in the terms and conditions of their employment by *inter alia,* subjecting them to disparate working conditions after Plaintiffs made several complaints of discrimination, in violation of 42 U.S.C. § 1981.

169.    Individual Defendants are personally, directly and individually liable, in that they aided and abetted the corporate Defendant in its unlawful retaliatory acts against Plaintiffs, in violation of 42 U.S.C. § 1981.

170.    Alternatively, in terms of the economic realities of the workplace, Individual Defendants are personally, directly, and individually liable as employers for the unlawful retaliation against Plaintiffs, in violation of 42 U.S.C. § 1981.

171.    Defendants' unlawful retaliation against Plaintiffs caused Plaintiffs to suffer emotional and psychological distress, physical injury, mental anguish, loss of enjoyment of life, humiliation, embarrassment, pain and suffering, and economic damages.

172.    Defendants acted with malice and/or reckless indifference to Plaintiffs' rights, entitling Plaintiffs to an award of punitive damages.

173.    Defendants are liable to plaintiffs for compensatory and punitive damages, attorney's fees, and costs.

**THIRD CAUSE OF ACTION:**
**Discrimination in Violation of the NYSHRL**

174.    Plaintiffs repeat and reallege each allegation above.

175.    Defendants unlawfully discriminated against Plaintiffs in the terms and conditions of their employment by, *inter alia,* treating them disparately on account of their race and gender, in violation of the NYSHRL.

176.    Defendants additionally discriminated against Plaintiffs in the terms and conditions of their employment by, *inter alia,* creating a hostile work environment in violation of the NYSHRL because of their race and gender.

177.    Individual Defendants are personally and directly liable in that they aided and abetted corporate Defendant in its unlawful discriminatory acts against Plaintiffs, in violation of NYSHRL § 296(6).

178.    Alternatively, in terms of the economic realities of the workplace, Individual Defendants are personally and directly liable as employers for the unlawful discrimination against Plaintiffs in violation of NYSHRL § 296(1).

179.    Defendants' unlawful discrimination against Plaintiffs caused Plaintiffs to suffer emotional and psychological distress, physical injury, mental anguish, loss of enjoyment of life, humiliation, embarrassment, pain and suffering, and economic damages.

180.    Defendants acted willfully, with malice and/or reckless indifference to Plaintiffs' rights.

181.    Defendants are liable to Plaintiffs for compensatory and punitive damages, attorney's fees, and costs.

**FOURTH CAUSE OF ACTION:**
**Retaliation in Violation of the NYSHRL**

182.    Plaintiffs repeat and reallege each allegation above.

183.    Defendants unlawfully retaliated against Plaintiffs in the terms and conditions of their employment on the basis of their race, in violation of the NYSHRL by, *inter alia*, terminating their employment and subjecting them to a hostile work environment on the basis of their protected activities.

184.    Individual Defendants are personally and directly liable in that they retaliated against Plaintiffs in violation of NYSHRL § 296(1).

185.    Alternatively, in terms of the economic realities of the workplace, Individual Defendants are personally liable as employers for the continuing unlawful discrimination against Plaintiffs in violation of NYSHRL § 296(6).

186.    Defendants' unlawful discrimination against Plaintiffs caused Plaintiffs to suffer emotional and psychological distress, physical injury, mental anguish, loss of enjoyment of life, humiliation, embarrassment, pain and suffering, and economic damages.

187.    Defendants acted willfully, with malice and/or reckless indifference to Plaintiffs' rights.

188.    Defendants are liable to Plaintiffs for compensatory and punitive damages, attorney's fees, and costs.

### FIFTH CAUSE OF ACTION:
### Discrimination in Violation of the NYCHRL

189.    Plaintiffs repeat and reallege each allegation above.

190.    Defendants unlawfully discriminated against Plaintiffs in the terms and conditions of their employment and constructively terminated their employment on the basis of race and sex, in violation of NYCHRL.

191.    Individual Defendants are personally and directly liable in that they aided and abetted the corporate Defendant in its unlawful discriminatory acts against Plaintiffs, in violation of NYCHRL § 8–107(6).

192.    Alternatively, in terms of the economic realities of the workplace, Individual Defendants are personally and directly liable as employers for the continuing unlawful discrimination against Plaintiffs in violation of NYCHRL § 8–107(1)(a).

193.    Defendants' unlawful discrimination against Plaintiffs caused Plaintiffs to suffer emotional and psychological distress, physical injury, mental anguish, loss of enjoyment of life, humiliation, embarrassment, pain and suffering, and economic damages.

194.    Defendants acted willfully, with malice and/or reckless indifference to Plaintiffs' rights.

195.    Defendants are liable to Plaintiffs for compensatory and punitive damages, attorney's fees, and costs.

### SIXTH CAUSE OF ACTION:
### Retaliation in Violation of the NYCHRL

196.    Plaintiffs repeat and reallege each allegation above.

197.    Defendants unlawfully retaliated against Plaintiffs in the terms and conditions of their employment and constructively terminated their employment on the basis of race and sex, in violation of NYCHRL.

198.    Individual Defendants are personally liable in that they aided and abetted the corporate

Defendant in its unlawful retaliatory acts against Plaintiffs, in violation of NYCHRL § 8–107(6).

199.    Alternatively, in terms of the economic realities of the workplace, Individual Defendants

are personally liable as employers for the continuing unlawful discrimination against Plaintiffs in

violation of NYCHRL § 8–107(1)(a).

200.    Defendants' unlawful discrimination against Plaintiffs caused Plaintiffs to suffer

emotional and psychological distress, physical injury, mental anguish, loss of enjoyment of life,

humiliation, embarrassment, pain and suffering, and economic damages.

201.    Defendants acted willfully, with malice and/or reckless indifference to Plaintiffs' rights.

202.    Defendants are liable to Plaintiffs for compensatory and punitive damages, attorney's

fees, and costs.

**SEVENTH CAUSE OF ACTION:**
**Violations of the Equal Pay Act, 29 U.S.C. § 206**

203.    Plaintiffs repeat and reallege each allegation above.

204.    Defendants paid Plaintiffs, and other female employees, less than their similarly situated

male colleagues, for substantially equal work, in violation of the Equal Pay Act, 29 U.S.C. § 206

*et seq.*

205.    Defendants required Plaintiffs, and other female employees, to perform the same or

substantially the same job position as other male employees, requiring equal skill, effort and

responsibility under similar working conditions, and paid Plaintiff at a rate of pay, including

salary, bonus and severance, less than such male employees. The differential rate of pay was not

part of or occasioned by a seniority system, merit system, a system based on the quantity or

quality of production, or upon a factor other than gender.

206.    Individual Defendants are personally, directly and individually liable in that they aided and abetted the corporate Defendant in their gender-based unequal payment of Plaintiffs in violation of EPA.

207.    Alternatively, in terms of the economic realities of the workplace, Individual Defendants are personally, directly and individually liable as employers for the gender-based unequal payment of Plaintiffs in violation of EPA.

208.    Defendants acted with malice and/or reckless indifference to Plaintiffs' rights, entitling Plaintiffs to an award of liquidated damages.

209.    Therefore, Defendants are jointly and severally liable to Plaintiffs for economic damages, liquidated damages, attorney's fees and costs.

### EIGHTH CAUSE OF ACTION:
### Violations of the New York Equal Pay Law

210.    Plaintiffs repeat and reallege each allegation above.

211.    Defendants paid Plaintiffs less than their similarly situated white colleagues for substantially equal work in violation of New York Equal Pay Law § 194.

212.    Defendants required Plaintiffs to perform the same or substantially the same job position as other, white employees, requiring equal skill, effort and responsibility under similar working conditions, and paid Plaintiffs at rates of pay, including salary, bonus and severance, that were less than such white employees. The differential rate of pay was not part of or occasioned by a seniority system, merit system, a system based on the quantity or quality of production, or upon a fact other than race.

213.    Individual Defendants are personally, directly and individually liable in that they aided and abetted the corporate Defendant in their race-based unequal payment of Plaintiffs, in violation of NYEPL.

214.     Alternatively, in terms of the economic realities of the workplace, Individual Defendants are personally, directly, and individually liable as employers for the race-based unequal payment of Plaintiffs in violation of NYEPL.

215.     Defendants acted with malice and/or reckless indifference to Plaintiffs' rights, entitling them to an award of liquidated damages.

216.     Therefore, Defendants are jointly and severally liable to Plaintiffs for economic damages, liquidated damages, attorney's fees and costs.

### NINTH CAUSE OF ACTION:
### Violations of the New York Equal Pay Law

217.     Plaintiffs repeat and reallege each allegation above.

218.     Defendants paid Plaintiffs, and other female employees, less than their similarly situated male colleagues, for substantially equal work in violation of New York Equal Pay Law § 194.

219.     Defendants required Plaintiffs, and other female employees, to perform the same or substantially the same job position as other, male employees, requiring equal skill, effort and responsibility under similar working conditions, and paid Plaintiffs at rates of pay, including salary, bonus and severance, that were less than such male employees. The differential rate of pay was not part of or occasioned by a seniority system, merit system, a system based on the quantity or quality of production, or upon a fact other than gender.

220.     Individual Defendants are personally, directly and individually liable in that they aided and abetted the corporate Defendant in their gender-based unequal payment of Plaintiffs, in violation of NYEPL.

221.     Alternatively, in terms of the economic realities of the workplace, Individual Defendants are personally, directly, and individually liable as employers for the gender-based unequal payment of Plaintiffs in violation of NYEPL.

222.     Defendants acted with malice and/or reckless indifference to Plaintiffs' rights, entitling

them to an award of liquidated damages.

223.     Therefore, Defendants are jointly and severally liable to Plaintiffs for economic damages,

liquidated damages, attorney's fees and costs.

### TENTH CAUSE OF ACTION:
### Unpaid Overtime in Violation of the New York Labor Law

224.     Plaintiffs repeat and reallege each allegation above.

225.     At all times relevant, Plaintiffs were employees within the meaning of NYLL § 190(2),

and Defendants were employers within the meaning of the NYLL §190(3).

226.     Defendants failed to pay Plaintiffs overtime wages to which they are entitled under the

NYLL Article 19 §§ 650 *et seq.*, and the supporting New York State Department of Labor

Regulations.

227.     Plaintiffs regularly worked in excess of 40 hours per week during the period of their

employment by Defendants.

228.     Defendants knowingly and willfully failed to pay Plaintiffs their overtime wages at time

and a half the regular hourly rate for all hours they worked in excess of 40 in each workweek.

229.     Individual Defendants were individual employers of Plaintiffs in that they had the power

to do more than just carry out personnel decisions made by others. Therefore, in terms of the

economic realities of the workplace, Individual Defendants are personally and directly liable as

employers, pursuant to §190(3), for the unlawful nonpayment of overtime wages to Plaintiffs in

violation of NYLL Article 6, §190, *et seq.*

230.     Defendants' failure to pay overtime wages was willful, thereby entitling Plaintiffs to

awards of 100% liquidated damages each, *i.e.* "double damages." Defendants are therefore

jointly and severally liable to Plaintiffs for the amount of their unpaid overtime wages plus an

additional equal amount as liquidated damages, plus 9% interest, attorneys' fees, costs and expenses.

## ELEVENTH CAUSE OF ACTION:
### NYLL § 195 Notice & Wage Statement Violations

231.    Plaintiffs repeat and reallege each allegation above.

232.    Defendants willfully failed to supply Plaintiffs with notice as required by NYLL § 195(1), in English or in the language identified by Plaintiffs as their primary language, containing their rate of pay and basis thereof, whether paid by the hour, shift, day, week, salary, piece, commission, or other; hourly rate of pay and overtime rate or rates of pay if applicable; allowances, if any, claimed as part of the minimum wage, including tip, meal, or lodging allowances; the regular pay day designated by the employer in accordance with NYLL § 191; the name of the employer; any "doing business as" names used by the employer; the physical address of the employer's main office or principal place of business, and a mailing address if different; the telephone number of the employer; plus such other information as the commissioner deems material and necessary.

233.    Defendants willfully failed to supply Plaintiffs with accurate statements of wages as required by NYLL § 195(3), in that the wage statements did not contain any information about the hourly rate or rates of pay and overtime rate or rates of pay, the number of hours worked, including overtime hours worked, or the allowances, if any, claimed as part of the minimum wage.

234.    Plaintiffs are entitled to recover statutory penalties from Defendants as provided for by NYLL § 198, as well as reasonable attorneys' fees, and costs.

**DEMAND FOR RELIEF**

WHEREFORE, it is respectfully requested that an Order be issued, granting judgment in favor of Plaintiffs, as against all Defendants, jointly and severally:

    a.  on the First, Second, Third, Fourth, Fifth, and Sixth Causes of Action, awarding compensatory and punitive damages, attorney's fees, and costs;

    b.  on the Seventh, Eighth, Ninth, and Tenth Causes of Action, awarding economic damages, liquidated damages, attorney's fees, and costs; and

    c.  on the Eleventh Cause of Action, awarding statutory penalties, attorney's fees, and costs.

**DEMAND FOR TRIAL BY JURY**

Pursuant to FRCP § 38(b), Plaintiffs demand a trial by jury.

Dated: Brooklyn, New York
       January 4, 2022

                              Respectfully submitted,

                              _____/s/_____

Susan K. Crumiller
Travis Pierre-Louis
Chloe Liederman
Crumiller P.C.
16 Court St, Ste 2500
Brooklyn, NY 11241
(212) 390-8480
susan@crumiller.com
travis@crumiller.com
chloe@crumiller.com
Attorneys for Plaintiffs